Casey R. Fronk (Illinois Bar No. 6296535)
fronkc@sec.gov
Amy J. Oliver (Utah Bar No. 8785)
olivera@sec.gov
Paul Feindt (Utah Bar No. 8769)
feindtp@sec.gov
Securities and Exchange Commission
351 South West Temple, Suite 6.100
Salt Lake City, Utah 84101
Tel.  801-524-5796
Fax: 801-524-3558
*Attorneys for Plaintiff*

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>PLAINTIFF,<br><br>v.<br><br>CONTXT, INC., a Utah Corporation, THOMAS J. ROBBINS, DANIEL J. MERRIMAN, MARK W. WISEMAN, and CLARK J. MADSEN, individuals,<br><br>DEFENDANTS. | **COMPLAINT**<br><br>Case No.:<br><br>Judge: |

Plaintiff, Securities and Exchange Commission (the "Commission"), for its Complaint against Defendants ConTXT, Inc. ("ConTXT"), Thomas J. Robbins ("Robbins"), Daniel J. Merriman ("Merriman"), Mark W. Wiseman ("Wiseman"), and Clark J. Madsen ("Madsen") (collectively, "Defendants") alleges as follows:

### INTRODUCTION

1. This matter involves two inter-related offering frauds orchestrated by securities fraud recidivists, Robbins and Merriman, in which they obtained approximately $11 million from at

least 80 investors in the form of a purported high-yield algorithmic trading program and through the fraudulent unregistered sale of stock.

2. Robbins and Merriman met while incarcerated and upon release, created a high-yield trading program based on an algorithm Robbins purportedly obtained in a spiritual revelation.

3. Beginning in 2016, Robbins and Merriman solicited investor funds through a series of false and misleading representations including that the Church of Jesus Christ of Latter-day Saints ("LDS Church") was a client; that they consistently generated large returns for prior trading program investors; and that investors could expect to earn profits of at least 20% per month. Robbins and Merriman misappropriated investor funds both to pay purported profits to earlier investors and to pay for their personal expenses. Funds that were invested in the trading program never generated profits for investors.

4. In 2017, Robbins and Merriman devised a new scheme with Madsen and Wiseman to fraudulently sell millions of shares of stock in ConTXT, a small company founded by Madsen in unregistered transactions.

5. By the time this scheme commenced in late 2017, Madsen and Wiseman knew that Robbins and Merriman were convicted felons and owed millions to their trading program investors. Nonetheless, Madsen and Wiseman needed funds for ConTXT and Robbins and Merriman agreed to fund ConTXT by selling its stock or by using funds from their trading program.

6. Madsen, through a board resolution, granted Robbins and Merriman financial control of ConTXT and authorized them to sell ConTXT stock and take any additional steps to take ConTXT public. However, because Robbins and Merriman were convicted felons, their involvement in ConTXT was actively concealed.

7. The Private Placement Memorandum ("PPM") and other documentation provided to investors falsely attributed the duties performed by Robbins and Merriman to a nominee. The Defendants knowingly distributed a PPM that contained false and misleading information about ConTXT's financial condition and profitability.

8. Robbins, Merriman and Wiseman also lied about the use of investor funds, misrepresented ConTXT's financial condition and misappropriated investor funds for their personal benefit.

9. Robbins and Merriman acted as unregistered brokers, participating at all key points in the distribution of ConTXT stock and received commissions for their efforts.

10. The Defendants fraudulently sold at least $942,800 of ConTXT stock in unregistered transactions and distributed millions of additional shares to satisfy prior debt obligations.

## JURISDICTION AND VENUE

11. This Court has subject matter jurisdiction under Sections 20 and 22 of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77t and 77v] and Sections 21 and Section 27 of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78u and 78aa].

12. Defendants, directly and indirectly, singly and in concert, made use of the means and instrumentalities of interstate commerce and the mails in connection with the transactions, acts and courses of business alleged herein, certain of which have occurred within the District of Utah.

13. Venue for this action is proper in the District of Utah under Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and under Section 27 of the Exchange Act [15 U.S.C. § 78aa] because certain of the transactions, acts, practices, and courses of business alleged in this

Complaint took place in this district and because each of the Defendants resides in and transacts business in this district.

14. Defendants, unless restrained and enjoined by this Court, will continue to engage in the transactions, acts, practices, and courses of business alleged herein and in transactions, acts, practices, and courses of business of similar purport and object.

15. Defendants' conduct took place in connection with the offer, purchase and/or sale of securities issued by Defendants.

## DEFENDANTS

16. **ConTXT, Inc.** ("ConTXT"), is a Utah corporation located in South Jordan, Utah. ConTXT, LLC was formed in November 2016 as a Utah limited liability company, and was incorporated in December 2017.

17. **Thomas J. Robbins** ("Robbins"), age 65, is a resident of Heber City, Utah. Robbins is the managing member and owner of ARC Holdings, LLC ("ARC Holdings"), Bot FX, LLC ("Bot FX"), and Entrepreneur Network USA, LLC ("ENUSA"). Robbins was also an undisclosed owner and control person of ConTXT.

18. **Daniel J. Merriman** ("Merriman"), age 50, is a resident of Kaysville, Utah. Merriman is a managing member and owner of ARC Holdings; ENUSA; DJM2013, LLC ("DJM"); and Real Internet Solutions, Inc. ("Real Internet"). Merriman was also an undisclosed owner and control person of ConTXT.

19. **Clark J. Madsen** ("Madsen"), age 47, is a resident of Sandy, Utah. Madsen is the founder, President and CEO of ConTXT.

20. **Mark W. Wiseman** ("Wiseman"), age 44, is a resident of Sandy, Utah. Wiseman is the Chief Marketing Officer of ConTXT.

4

## RELATED PARTIES

21.     **ARC Holdings, LLC** is a Utah limited liability company controlled by Robbins and Merriman.  Robbins and Merriman ran their high-yield trading program through ARC Holdings.  ARC Holdings provided Investor Relations for ConTXT.

22.     **Bot FX, LLC** is a Utah limited liability company owned and controlled by Robbins.  Robbins also used Bot FX as an entity to run the high-yield trading program.

23.     **Entrepreneur Network USA, LLC** is a Nevada limited liability company owned and controlled by Robbins and Merriman.

24.     **Real Internet Solutions, Inc.** is a Nevada corporation with its principal place of business in Provo, Utah.  Real Internet has a large group of investors—comprising the Percentage Investment Club, LLC ("Club")—located throughout the U.S. and concentrated in and around Idaho, Oregon and Washington.  Robbins and Merriman used the Club's newsletter to offer ConTXT stock.

## STATEMENT OF FACTS

### Background

25.     Beginning in 2016, Robbins and Merriman, through multiple entities they control, including ARC Holdings, LLC, Bot FX, LLC, and Entrepreneur Network USA, LLC, carried out two interrelated offering frauds (1) in the form of a purported high-yield algorithmic trading program and (2) through the fraudulent sale of unregistered stock in ConTXT.

26.     The two schemes are interrelated for several reasons.  First, Robbins and Merriman pitched both schemes to prospective investors at the same time.  Thus, several investors are victims in both frauds.  Second, Robbins and Merriman issued ConTXT stock to compensate investors who incurred losses in the trading program scheme and also sold ConTXT

stock to fund the trading program. Finally, in their agreement with ConTXT, Robbins and Merriman agreed to generate funds for ConTXT from both the trading program and through the sale of ConTXT stock.

### Robbins and Merriman Solicit Investors for their Trading Program

27. Robbins and Merriman, who met while incarcerated for their roles in separate and unrelated securities fraud cases, reunited in approximately March 2016 to start a trading program for investors. Robbins and Merriman created ARC Holdings for this purpose. Robbins functioned as the trader and Merriman handled the administrative and accounting part of the business.

28. In approximately August 2016, Robbins and Merriman began to solicit and accept investors for their trading program.

29. Robbins and Merriman told investors that Robbins had a "spiritual revelation" in 2008 about an exclusive algorithm for trading currencies, commodities, indices, stocks, bonds, ETFs, and other instruments but could not bring the vision to reality until 2011, when the technology caught up to his vision.

30. Robbins and Merriman also told investors they had generated "phenomenal" rates of return from their proprietary algorithmic trading program and had a proven history of generating positive returns for their investors of approximately 20%–50% per month. Robbins and Merriman provided several investors with written account projections that showed returns of 7.5% per week and up to 50% per month.

31. Robbins and Merriman told investors that the trading program had almost no risk because they made small trades, maintained a low float, had stop losses in place, and that the algorithm had a built-in system of buying into momentum and selling as the price decreased.

Robbins and Merriman claimed they had a team of over 50 programmers and mathematicians located throughout the world who constantly monitored and improved the high frequency trading program to manage any risks.

32.     Robbins and Merriman frequently referenced their religious faith to develop rapport with prospective investors and told prospective investors that the LDS Church was a trading program client.

33.     Robbins and Merriman told investors that Robbins was an experienced investment banker with extensive work experience in Europe, that he had taken at least seven companies public, and that he was a successful trader with a wealth of sophisticated clients including the Rothschild family, the Kennedy family, the royal family of Thailand, and several major banks.

34.     In order to utilize the trading program, investors entered into an investment contract with ARC Holdings or Bot FX which took 50% of the profits and paid the remaining 50% to the investor.

35.     Robbins and Merriman located new investors for their trading program through a network of "finders."  Robbins and Merriman promised the individuals functioning as finders 50% of the profits earned by each trading program investors solicited by the finder.  Robbins and Merriman also solicited investors through social media, thus engaging in a general solicitation.

36.     While some trading program investors deposited their funds directly into a brokerage account and authorized Robbins and Merriman to execute trades, other investors gave their money directly to Robbins and Merriman.  In some instances, Robbins and Merriman made no effort to trade the investor's funds and simply misappropriated the money to pay for their personal expenses or to pay purported profits to earlier investors.

37. Since August 2016, every investor whose funds were traded by Robbins and Merriman lost virtually all of their money within a matter of weeks or months at the longest. Robbins and Merriman blamed these losses on a variety of external causes, including problems at the brokerage firms and "flash crashes." Despite losing virtually all funds invested in the trading program, Robbins and Merriman told new prospective investors that they had consistently generated significant profits for their prior investors.

38. During 2016, Robbins and Merriman met Madsen and Wiseman. Madsen and Wiseman had recently formed a fledgling tech company, ConTXT, and rented office space in the same building as Robbins and Merriman. The group became friends and Robbins and Merriman pitched their trading program to them. Wiseman invested with Robbins and Merriman in September 2016.

39. After Wiseman's September 2016 investment, Wiseman and Madsen learned that both Robbins and Merriman had previously been criminally convicted of securities fraud and had regulatory disciplinary histories. Madsen and Wiseman also learned that numerous other trading program investors were angry because they had not been paid as promised by Robbins and Merriman.

### The Scheme to Fraudulently Sell Unregistered ConTXT Stock

40. Despite knowledge of Robbins' and Merriman's criminal convictions and their failure to pay investors in their trading program, in December 2017, Madsen, Wiseman and ConTXT entered into an arrangement with Robbins and Merriman for them to raise funds for ConTXT and take ConTXT public. In order to raise funds for ConTXT, Robbins, Merriman, Madsen and Wiseman agreed to incorporate ConTXT issuing 100 million shares to split between themselves while leaving a portion of the newly issued shares in the name of ConTXT.

8

41. In exchange for the 37.5 million ConTXT shares issued to Robbins and Merriman, they agreed to pay Madsen, Wiseman and ConTXT at least $1,018,769.41. Both Madsen and Wiseman understood that Robbins and Merriman would meet their funding obligation by selling ConTXT stock and by generating money through their trading program.

42. Within a few days of incorporating and receiving ConTXT stock, Robbins and Merriman sold an investor 750,000 ConTXT shares for $150,000 and told the investor that his money would help fund ConTXT's business operations. Robbins, Merriman and ConTXT all contributed stock titled in their names for this purchase. Robbins and Merriman deposited the check into a ConTXT bank account for which they were the only signatories and only authorized users. From these funds, Robbins and Merriman paid Madsen $29,000, Wiseman $20,000, kept $76,730 for themselves, and spent the rest on miscellaneous expenses.

43. In early January 2018, Madsen formally granted Robbins and Merriman financial control of ConTXT, which included the establishment and control of bank accounts and brokerage accounts, all accounting and bookkeeping responsibilities, and all investor related activities. Madsen also officially authorized Robbins and Merriman to sell ConTXT stock, issue ConTXT stock certificates (although Madsen insisted that he sign all stock certificates so he could maintain oversight), maintain the shareholder log, communicate on behalf of ConTXT with potential investors and current shareholders, and conduct any other activities necessary for ConTXT to become a publicly traded company, including through the use of third-party professionals.

44. Robbins and Merriman functioned as officers and directors of ConTXT and had complete financial control of the company. However, because Robbins and Merriman were convicted felons with SEC disciplinary records, the Defendants concealed Robbins' and

Merriman's involvement in and 37.5% ownership of ConTXT.  The Defendants knew that Robbins' and Merriman's criminal and regulatory histories would make it more difficult to raise investor funds and would require additional disclosures should ConTXT merge with a public company.

45. To conceal Robbins' and Merriman's involvement in ConTXT, the Defendants agreed to appoint Robert Whitaker ("Whitaker"), a nominee selected by Robbins and Merriman, to serve as ConTXT's Secretary, Treasurer and Director.  Madsen knew at the time he appointed Whitaker to this role, Whitaker "would just be a name on a paper and have no real involvement." Whitaker provided no services to ConTXT and never attended any board meetings.  Other ConTXT employees described Whitaker as merely a "puppet" for Robbins and Merriman.

46. Although each Defendant knew that Whitaker was a nominee for Robbins and Merriman, that fact was actively concealed from investors.  Investors were provided with lengthy biographical information about Madsen and Whitaker in ConTXT's Business Summary and PPM even though each Defendant knew that Robbins and Merriman performed all duties falsely attributed to Whitaker and that Whitaker had no involvement in ConTXT.

47. Robbins and Merriman solicited investors for their trading program while also selling ConTXT stock and, frequently, the same investor was pitched both investment opportunities at the same time.  Robbins and Merriman continued to make the same false and misleading statements about their trading program along with new misrepresentations about ConTXT: including that they had no managerial duties at ConTXT and were simply shareholders and misrepresentations about the use of investor funds.  Robbins and Merriman either omitted or misrepresented the nature and disposition of their prior criminal and regulatory histories.

48. Madsen and Wiseman attended some of these meetings and were both aware of the misrepresentations and omissions. Wiseman frequently affirmed the false statements made by Robbins and Merriman, and falsely represented that he had earned substantial profits from Robbins' and Merriman's trading program.

49. The Defendants knew that investor funds (whether for the trading program or ConTXT) would not be used as represented but would instead be used to repay other investors, to repay prior debt obligations, and for personal expenses. Robbins and Merriman lost virtually all funds invested in their trading program. When confronted by trading program investors, Robbins and Merriman, with the knowledge and consent of Madsen and Wiseman, issued ConTXT stock to purportedly reimburse investors for trading program loses, sold ConTXT stock and used the funds to repay earlier investors, sold additional shares of ConTXT to trading program investors, and used the proceeds from ConTXT stock sales to fund their trading program.

## ConTXT Stock Offered and Sold in a General Solicitation

50. In April 2018, Robbins and Merriman exchanged a million shares of their ConTXT stock, which they had moved into an entity named ENUSA, for a 51% ownership interest in Real Internet, a small Idaho-based business. Real Internet, which purportedly was developing tax preparation software, had a large group of investors located in several states called the Percentage Investment Club ("Club"), which consisted of approximately 73 people.

51. Robbins and Merriman solicited investors for ConTXT using the Club's newsletter, The Money Tree ("newsletter"). The newsletter is distributed via email to Club members on a periodic basis, typically monthly or quarterly. Beginning in April 2018, the

newsletter offered its Club members a limited time opportunity to invest in ConTXT and proclaimed that for as little as $2,500, an investor could buy 12,500 ConTXT shares.

52. The individuals who purchased ConTXT from this solicitation sent their investment funds to ENUSA and the shares were transferred from ENUSA to the investor. Robbins and Merriman created the stock certificates, updated ConTXT's shareholder log, and Madsen signed the stock certificates. Merriman signed the share transfer agreements as "Authorized Transfer Agent" for ConTXT and either Whitaker or Robbins signed on behalf of ENUSA. None of the Club members had a pre-existing relationship with ConTXT or ENUSA and no effort was made to determine if the investors who purchased ConTXT stock through the newsletter were accredited investors at the time of purchase.

53. Madsen personally signed every ConTXT stock certificate and knew that ConTXT had added numerous people to its shareholder list. At least 22 investors purchased $241,129 of ConTXT stock through the newsletter. Robbins and Merriman kept virtually all of these funds.

**The Defendants Distributed a False and Misleading PPM to Investors**

54. As part of the agreement to take ConTXT public, in May 2018, the Defendants engaged a third-party to help create a PPM to use with potential investors. The financial projections included in the PPM had no backup to substantiate the positive forecasting and the information contained in the PPM was inaccurate and contained false and misleading financial information about ConTXT. The PPM contained overstated facts and "heavily exaggerated" financial forecasting. Madsen characterized the PPM as "garbage" and others described it as ridiculous.

55. However, the PPM was distributed to potential ConTXT investors and all Defendants either provided the PPM to investors or participated in meetings with investors where the PPM was discussed. No investor was ever told that the PPM was inaccurate.

56. In the summer of 2018, Wiseman emailed the PPM to a potential investor he met online and offered to sell her ConTXT stock. Wiseman misrepresented the value and profitability of ConTXT and falsely represented that the proceeds of any stock sale would be used to hire software engineers at ConTXT. Wiseman also promised to pay her a 5% commission for referring other ConTXT investors.

57. Wiseman told her, "shares are going at 5 cents per share right now and will increase by November to around 20 cents per share." Wiseman told her "we are valued at a $25,000,000 company right now and climbing." Wiseman encouraged the investor to send the PPM to other people including her brother-in-law and her hairdresser.

58. Wiseman assured her that he would return her investment money if she needed it and also promised to buy her stock back for 40 cents per share within six months. Based on those assurances, the investor sent Wiseman $1,000 and he, with approval from Madsen, issued her 5,000 ConTXT shares. Madsen signed the stock certificate, Robbins and Madsen updated the shareholder log, and Wiseman deposited her investment funds into his personal bank account. None of the funds went to ConTXT.

**Robbins and Merriman Sold Bogus Shares of ConTXT**

59. Robbins and Merriman sold ConTXT stock through at least April 2020, including some sales where Robbins and Merriman did not even own the ConTXT stock they purported to sell. For example, Robbins fraudulently sold 1.1 million ConTXT shares for $100,000 and created and signed a fictitious ConTXT stock certificate that was not recognized or recorded by

ConTXT.  Although the investor believes he is a ConTXT shareholder, ConTXT has no record of this shareholder and the stock certificate number created by Robbins does not match any certificate at ConTXT.  Robbins used some of the funds from the purported stock sale to pay fictitious returns to a trading program investor and used the rest for personal expenses.

60. Merriman also fraudulently sold ConTXT stock.  For example, in January 2020, Merriman told an investor that he worked for ConTXT and offered to sell the investor 100,000 shares.  Using funds held in her retirement account, the investor paid Merriman $10,000.  Merriman signed a Stock Repurchase Agreement whereby he agreed to repurchase the shares for $11,000 in six months.  Merriman never gave the investor a stock certificate and ConTXT does not show that the investor is a ConTXT shareholder.  Despite several requests from the investor, Merriman has not returned the funds to the investor.

61. Robbins and Merriman sold a total of approximately 16,611,200 ConTXT shares for at least $942,800.  Robbins and Merriman transferred an additional 12,064,160 ConTXT shares to repay millions in trading program losses and to discharge other debts.  Of this amount, Robbins and Merriman gave $269,187 to ConTXT (which includes a $29,000 payment directly to Madsen) and paid Wiseman $40,000.  Wiseman also sold ConTXT stock from which he earned approximately $28,500.

**FIRST CAUSE OF ACTION**
**FRAUD IN CONNECTION WITH THE PURCHASE AND SALE OF SECURITIES**
**Violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(a) and (c) thereunder [17 C.F.R. § 240.10b-5(a) and (c)]**
**(All Defendants)**

62. The Commission realleges and incorporates by reference the allegations contained in Paragraphs 1 through 61, above.

63. Defendants, by engaging in the conduct described above, directly or indirectly, by the use of means or instrumentalities of interstate commerce or use of the mails, in connection with the purchase or sale of securities, with scienter, (1) employed devices, schemes, or artifices to defraud; (2) made untrue statements of material fact or omitted to state a material fact necessary in order to make statements made, in light of the circumstances under which they were made not misleading; or (3) engaged in acts, practices, or courses of business that operated or would operate as a fraud and deceit upon other persons.

64. By reason of the foregoing, Defendants violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5(a) and (c) thereunder [17 C.F.R. § 240.10b-5(a) and (c)].

## SECOND CAUSE OF ACTION
## FRAUD IN CONNECTION WITH THE PURCHASE AND SALE OF SECURITIES
Violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and
Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)]
(Robbins, Merriman, and Wiseman)

65. The Commission realleges and incorporates by reference the allegations contained in Paragraphs 1 through 61, above.

66. Defendants Robbins, Merriman, and Wiseman, by engaging in the conduct described above, directly or indirectly, by the use of means or instrumentalities of interstate commerce or use of the mails, in connection with the purchase or sale of securities, with scienter, (1) employed devices, schemes, or artifices to defraud; (2) made untrue statements of material fact or omitted to state a material fact necessary in order to make statements made, in light of the circumstances under which they were made not misleading; or (3) engaged in acts, practices, or courses of business that operated or would operate as a fraud and deceit upon other persons.

67. By reason of the foregoing, Defendants Robbins, Merriman, and Wiseman violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)].

### THIRD CAUSE OF ACTION
### EMPLOYMENT OF A DEVICE, SCHEME OR ARTIFICE TO DEFRAUD
**Violations of Sections 17(a)(1) and (3) of the Securities Act [15 U.S.C. § 77q(a)(1) and (3)]**
**(All Defendants)**

68. The Commission realleges and incorporates by reference the allegations contained in Paragraphs 1 through 61, above.

69. Defendants, by engaging in conduct described above, directly or indirectly, in the offer or sale of securities, by the use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, with scienter, employed devices, schemes, or artifices to defraud.

70. By reason of the foregoing, Defendants directly or indirectly, violated, and unless restrained and enjoined by this Court, will continue to violate, Section 17(a)(1) and 17(a)(3) of the Securities Act [15 U.S.C. § 77q(a)(1) and and 77q(a)(3)].

### FOURTH CAUSE OF ACTION
### FRAUD IN THE OFFER AND SALE OF SECURITIES
**Violations of Section 17(a)(2) of the Securities Act**
**[15 U.S.C. § 77q(a)(2)]**
**(Robbins, Merriman, and Wiseman)**

71. The Commission realleges and incorporates by reference the allegations contained in Paragraphs 1 through 61, above.

72. Defendants Robbins, Merriman, and Wiseman, by engaging in the conduct described above, directly and indirectly, in the offer and sale of securities, by the use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, obtained money or property by means of untrue statements of material fact or by omitting

to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and engaged in transactions, practices, or courses of business which operate or would operate as a fraud or deceit upon the purchaser.

73. By reason of the foregoing, Defendants Robbins, Merriman and Wiseman directly or indirectly, violated, and unless restrained and enjoined will continue to violate, Section 17(a)(2) of the Securities Act [15 U.S.C. §§ 77q(a)(2)].

### FIFTH CAUSE OF ACTION
### OFFER AND SALE OF UNREGISTERED SECURITIES
**Violation of Sections 5(a) and (c) of the Securities Act [15 U.S.C. § 77e(a) and (c)]**
**(All Defendants)**

74. The Commission realleges and incorporates by reference the allegations contained in Paragraphs 1 through 61, above.

75. Defendants, by engaging in the conduct described above, directly or indirectly, through use of the means or instruments of transportation or communication in interstate commerce or the mails, offered to sell or sold securities or, directly or indirectly, or carried such securities through the mails or in interstate commerce, for the purpose of sale or delivery after sale.

76. No registration statement has been filed with the Commission or has been in effect with respect to these securities.

77. By reason of the foregoing, Defendants violated, and unless enjoined will continue to violate, Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)].

## SIXTH CAUSE OF ACTION
**OFFER AND SALE OF SECURITIES BY AN UNREGISTERED BROKER OR DEALER**
Violation of Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)]
**(Robbins and Merriman)**

78. The Commission realleges and incorporates by reference the allegations contained in Paragraphs 1 through 61, above.

79. Defendants Robbins and Merriman, by engaging in the conduct described above, directly or indirectly, made use of the mails or the means or instrumentalities of interstate commerce to effect transactions in, or to induce or attempt to induce the purchase and sale of, securities without being registered as a broker or dealer with the Commission or associated with a broker-dealer registered with the Commission.

80. By reason of the foregoing, Defendants Robbins and Merriman violated, and unless enjoined will continue to violate, Sections 15(a) of the Exchange Act [15 U.S.C. §§ 77o(a)].

**RELIEF REQUESTED**

WHEREFORE, the Commission respectfully requests that this Court:

**I**

Issue findings of fact and conclusions of law that Defendants committed the violations charged herein.

**II**

Issue in a form consistent with Rule 65(d) of the Federal Rules of Civil Procedure orders that temporarily, preliminarily and permanently enjoin Defendants from engaging in transactions, acts, practices, and courses of business described herein, and from engaging in conduct of similar purport and object in violation of Sections 5(a), 5(c) and 17(a) of the Securities Act, and Section 10(b) and 15(a) of the Exchange Act and Rule 10b-5 thereunder.

### III

Enter an order directing Defendants to pay civil money penalties pursuant to Section 20(d) of the Securities Act and Section 21(d)(3) of the Exchange Act.

### IV

Enter an order directing Defendants to disgorge all ill-gotten gains received during the period of violative conduct and pay prejudgment interest on such ill-gotten gains.

### V

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

Dated this 7th day of January, 2021.

Respectfully submitted,

   /s/ *Casey R. Fronk*
Casey R. Fronk
Amy J. Oliver
Paul Feindt
*Attorneys for Plaintiff*